Good morning, Your Honors. My name is Christine Sportney, and I represent K. Jemel Walker, the plaintiff appellant in this case. This court previously stated in Johnson v. California that the goal of eradicating discrimination is no less laudable in the prison context. In its appeal, K. Jemel Walker, an inmate at Calipatri Estate Prison, seeks to further this laudable goal by eliminating Calipatri Estate Prison's practice of denying African Americans critical worker status and contact visits solely because of their race during lockdowns at Calipatri Estate Prison subsequent to violent incidents of gang violence. Can you explain to me, very simply, what exactly your client claims is the violation here? I'm sorry, what was that? Can you explain to me exactly what the factual basis for the claim is here? His claims? In 19- Simple terms, please. In 1995- This is a policy, right? Pardon? It's a policy. Yes. What is the policy? The policy is that whenever there is a violent incident that's caused by a gang member of the African American race, subsequent to that incident, the prison is locked down, and then the prison designates critical workers to keep the prison going. And when they decide to designate these critical workers, they decide that if an inmate shares the same color skin as that of the inmates that caused the violent incident, then they are denied an opportunity to be deemed a critical worker. What is unreasonable about that when you have, as you did here, a series of incredibly violent incidents and a judgment made by the officials on the scene that it was important, at least on a temporary basis, to keep the combatants, both of whom were race-based, from mingling with other inmates? Well, there are two primary things that make it unreasonable. The first is that each of the incidents, it was identified the members were gang members. They were African American, but in the first incident, they belonged to the East Coast Crips. The second incident, they were East Coast Crips and Rolling Forties Crips. And the last one, it was a single person acting. And in each of those cases, they knew they were gang-related. They also knew that Mr. Walker was not a gang member. It is easy enough for us to say now, looking back on it, but at the time, why do we have any business imposing on prison officials who are dealing with an incredibly violent series of incidents some kind of constraint that may seem now to make sense, but why should we impose it on them? Well, that leads to the second point that makes it unreasonable, is that at the same time they were telling African Americans that they could not be critical workers. And they are select spots that are jobs at the institution that are deemed critical worker. They were also allowing African American inmates, without any further screening process, to access the law library. So there's a compelling reason to do that, because those inmates have a clear constitutional right to access legal materials, whereas the inmate has no right to work. I mean, that's one point. And the second thing is, so what? I mean, the critical worker list was compiled prison-wide, whereas this was just for the library. So why make an exception for the library from other areas where critical workers work? Well, the exception, it's not so much an exception, it's an idea that he was being treated, or he was being denied this critical worker status solely because he was African American. And he had a record, as do others, where he'd been in this position for three years without incident. They knew he wasn't a gang member. And he got his job back the minute the crisis was over. Excuse me? That's true. And he got his job back the minute the crisis was over. He did eventually, yes, but that was after other people had been deemed critical workers that were white or others that didn't have as much experience that were also in the same facility and weren't able to do the job as well as he could have done it. And he was being told that simply because he was black, he couldn't be a critical worker, despite the fact that he had the knowledge and he had the ability and he had the experience. I take it you don't object to the lockdown as such, I gather from the briefs, because everybody in the prison was locked down, I take it. Right. The lockdown, I understand. It's a subsequent decision to determine how you deem someone a critical worker. Had it only been blacks that were locked down or African Americans, I take it you would be objecting to that. Is that correct? If all they did was lock down African Americans, I assume that what you're asking us to decide here would go to that also, right? You would object to that, correct? If they were only. Sure. They said, look, an African American involved in an incident. And therefore, we're going to lock down every African American in the prison, but only the African Americans. I take it the principle you're asking us to step to decide would also apply to that situation. Is that right? As long as you could determine that the lockdown of the African Americans, all African Americans was reasonably related to the prison security objective of maintaining, containing the violent incident, then yes. But in a case where you're locking down the whole entire prison after an incident and then making a distinction among inmates solely based on the color of the skin, that is what we object to. Well, my hypothetical was solely based on the color of their skin. We're going to lock down all African Americans. And you said, well, that's OK if it's reasonably related to prison discipline and blah, blah, blah. It sounds like this is no different. I mean, on your theory anyway, if not releasing African Americans is reasonably related to prison discipline, then you would say it's OK, right? So your objection is it is not reasonably related. Is that correct? Yes. In this particular instance where these three gang violent incidents where the institution was locked down and then he was told that based on his race. So what do you do with that? In other words, if I'm hearing you right, if workers go there who are not American, is that right or wrong? I'm assuming that you're working from a prison and you're. So I'm asking what difference. Well. Status. And so, yes, if Mr. Walker had worked in the. Job to keep the prison running and. Is this a race? So they said. You can you can show up to work. Then there was still. Patient that's still in the color of his skin. So the fact. Whether you make a decision based upon the color. Because a black somewhere in the prison does. It's inappropriate to say what's a black. That's your. Prisoners who started. White prisoners. Asked if there has been an upright if there's been incident concerning his that they impulse. Terminatory. Applied to. All people in the same race. It is not discriminatory. In the different sense that. That whites. If the people that started since I white. If I. Was. Was. Then when they. Open that racial people inmates of that race were not. Right. So what is irrational. But within the environment. So. Not be sued to a. It's really different here where is it. Have a common sense to a. Turn in the prison. It's be a. So my question. To rash. To you what's irrational. The riot. And you got down. Subsequent lockdown you still need to. Try. And regain. Normal. Now. I mean. Why. Rationality means. Every person. Come up with. This policy of. Time. The race of. People start the riot. First were. Other inmates. I think the answer that probably has to be yes. You can see that that is the press. That the. The strict rationality is the best. We know it's not outside. It's something else. We're not quite sure what it is anymore. After the Michigan case. Something else. Do you. Conceive the premise of. This question. That it. Has that needs to be rationally. Yeah. The test that I've been operating under for this is that it needs to be rational or reasonable under Turner be safely that. A rational connection to prison safety. Exactly. So the idea would be that if you're going to use this racial classification. It has to be reasonably related. Rationally related. To the objective of. Obtaining. Rationality. Is a standard. With no. Teeth. At all. Almost. Anything is rational. Very few policies. But you are. Yes. In Johnson it used the Turner be safely test. With respect to racial classification that was used in housing. No it wasn't. But they used it. They use the First Amendment case if I recall. But they did apply that test to. The racial classification. It can pass the rational test and still not meet all the Turner factors or the balancing of the Turner factors. Is that true. I'm sorry. It may be rational. And yet. There are other factors in Turner. Are there not. For example it can't be an over it can't be an excessive reaction. Can be. Can be rational. But excessive. Can it not. Isn't that one of the Turner factors. You just want to go the rationality. We find it's rational. That's the end of the game. That's OK with me. Well. I don't want to put words in your mouth either. No. Well if you apply. That. Test. It seems that there is enough that weighs in favor of finding that it's not rational. Well. I mean. You say that there's a rational. There needs to be a rational relationship. And then to determine that you would apply that four factor test that was set forth in Turner. And that was applied in Johnson v. California which was an equal protection case. And in there although the court came out the other way. It seems that there are enough differences that you could make. You can make the argument that just choosing critical workers based on the color of their skin is not. You know it's funny because in Johnson. We said there are four factors. Number one we ask ourself is there a valid rational connection. That's one. And then we went on to the other three. Right. But you are suggesting that it all just comes down to rational. That's OK. That's the principle. Well there's. Is there any possible way. Way that there is a. That the record shows that there were alternative means for. Walker that there were not any alternative means for Walker to assert his right to a segregation free environment. Which. Can. Save for the critical job thing. Right. Well. You know if I walk. That's his basic right is that is to be in a prison that doesn't. That doesn't. Discriminate in general. And it didn't. Right. I mean the record doesn't show anything other than his placement on the critical list. But the record does show that. This is an ongoing policy. That it's not. That it's not limited in duration. That after every incident. So it's different. Reasonable alternatives. Possibly exist in that he mentions that he. Prior times he's been screened. There's no segregation by race in this prison. At all. Other than this particular instance. No. It's a foreign integrated. You would have to agree that the impact of letting this situation go without any constraint could have been huge on the prison officials, on guards, and on other inmates. Right? Correct. All right. And if there are in terms of reasonable alternatives from the perspective of the prison. In Johnson we indicated. I mean the prisoners, the inmate has not shown that there were reasonable alternatives. And it isn't self-evident that individual screening mechanisms would have worked in that crisis situation. Is it? Well, in Johnson the screening process wouldn't work because it were inmates coming into temporary housing. Here it's different in that all the inmates are actually already at the prison. They already have files maintained on them. The prison officials already know what their temperaments are and probably have a good idea of whether or not they're being related. So you think they should have searched through those files in, what, 24 hours for all the prisoners? Well, they had previously. Or three days? Or are you saying it just took them too long to get around to doing that? Well, they had previously screened Mr. Walker back after the May incident. And then a month later we're telling him that that screening wasn't good anymore. And nothing, well, nothing had really changed as far as he was concerned. I mean he. Well, they don't know that. Do they? I mean he could have gotten scared in the meantime and gone over to the bad guys. Couldn't he have? Well, after having worked there for three years and with the record that he had, it would be highly unlikely that he would have done that. And in the, excuse me? The presumption on the line, on this question, is that one is, a prisoner is more likely to go over to the bad guys. He shares the skin color of the bad guys. And I'm wondering whether you're conceding that. Are you conceding that it's more likely? I mean it's entirely possible that somebody who's a trusted prison employee could switch allegiances in an emergency situation. You concede that. You have to concede that. It's possible. Anything can happen in prison. The real question is, is it more likely to happen if the prisoner in question is of the same race as Jesus? Maybe you're conceding that is in fact so. I'm just wondering whether you are. I don't know that there is anything definitive that says it is more likely that an African American, just by virtue of being the same color as the people that created a violent incident, are going to be more likely, especially in a situation where, like Mr. Walker, where he has been in that job for three years and he has, he's advanced within that job and has had good behavior. So. You are a minute and 42 seconds into your overtime. Okay. I'm going to give you a little bit of time. Pardon me? I'm sorry. I think we'll hear from you on the side. Okay. And I'll give you a couple minutes for remarks on any of that. Okay. Thank you. Thank you, Your Honors. Robert Helfand on behalf of the defendants. This particular claim for the equal protection involves six different incidences, and each of these incidences are a little different. The first one, which was on May 2nd of 1994, involved racial fighting with Hispanic and black inmates. The prison was locked down, and then there was what's called a modified lockdown of both Hispanic and the black inmates, and the other inmates were allowed to proceed with normal programming. That occurred on 5-2-94. Are you conceding that some of the incidents are problematic and some are not? Well, there's a. . . For example, there's a one-on-one incident. Depending on the circumstances that existed, because the second. . . excuse me, the third incident, which was on 12-9-94, is that a Hispanic was allowed out to go shower, and they had allowed a black to use the phone, so he had to pass by, and the result of that was one stabbed inmate. And then so that you may say, well, that's a one-on-one incident, but according to the pattern that we had seen, that there had been extreme racial fighting. Well, by the incident where a staff member is stabbed by a African-American, and that's treated the same way as the other things. It was until the investigation. . . October 31, 1995. Correct. There had been a series of problems, and I think that we had addressed that from the time that this prison opened, which is Calipatria, to the time that these incidents occurred. There was a racially charged atmosphere there. Prison gangs were by race, and that in order to control the situation and cool it down and allow time for investigation, they would lock down everybody, check all the yards for weapons and so on, then go back and then try to modify it. The 10-31-95. . . The question is, the real problem that's being put to us, and I suppose to you, is, is it not only rational, but also reasonable under the fourth element to say, any time a black does something really violent and wrong, all blacks are going to be locked down. Now, I understand we locked down the whole prison, but I think that's almost irrelevant in a sense for this purpose, because all prisoners weren't locked down exactly the same way. Blacks were locked down in some special way. So an African-American does something wrong, and all other African-Americans are sort of tainted with that same thing. I take it. . . Consul was asked and didn't exactly answer. Consul was asked, you know, when a white gang member does something, does that mean all the prisons are locked down and the whites can't go to their critical job? Consul answered as to Hispanics. I know that Hispanics are considered whites in one sense, but often they're segregated off from whites. And in the prisons, I think, they're not exactly the same. No, they're not. And. . . So the question is, I take it that when a white stabs a guard, the whole place is shut down also and the whites can't get released. Is that correct? That's correct. Anecdotally or just in principle? That is the principle is that whatever group is involved until they can find out what it is. Anecdotally, has that occurred? Do you know? Or is that part of this record? The record probably doesn't show, right? The record was limited to the six incidents. But I would say that on the October 31, 1995 incident, which was a single staff member  It was more than one inmate. The entire prison was locked down until the investigation showed what it had to show. And then as soon as the investigation was complete, then the workers were returned to work, including Mr. Walker. The record was a little unclear on the 10-31-95 incident. My understanding would be is that as soon as they would determine that there was a calm down, there would be certain jobs that would be released, correct? Well, the incident in the declaration says that, indeed, as a result, some people were released, but African Americans were not. Correct. There was something brought up by counsel. What does it mean that's correct? That's what's alleged? That's what was alleged. No, that's what Sylvia Garcia said in the declaration. Right. That's what she stated. Is she just alleging? Well, she's saying that they I thought she was one of your She was the chief deputy warden. She was the chief deputy warden. So this is the concession, not the investigation. Correct. Correct. I'm sorry that I misspoke. So, essentially, you are conceding, or for purposes of appeal, we have to take it as conceding that there is a policy or practice whereby the release of particular positions and the e-lockdown is tied to some extent to the skin color of the people, for instance, inmate or inmates involved in the e-lockdown. It would be inmates. No, there wouldn't have been a case where the one inmate stabbed the guard. There was not one incident, Your Honor, in which there was only a single inmate. My recollection is on the October 31st, it was more than one involved. Then that stabbed the guard? Correct. But if there were an incident where a single inmate stabbed the guard, the racial that inmate would govern who gets released? No. No. They would look to see the factors involved in the incident. If it was, for instance, an argument that preceded it that was personal to that individual, it would not. It would be where they're not sure. We had a series of incidences starting in May of 1995. But again, we're on summary judgment, and so we have to look at Plankett's case. And I understand that the police created a material issue of fact on the point that there is a direct link between the race of the inmates involved in the original incident and the cause of the lockdown and the order of release or order of the lockdown or the order of release for critical drug possession of the inmates. So if the inmate or inmate started this and is or are black, blacks get released last for critical drug possession, or maybe not at all. Or maybe not at all, right. That's the record, right? But the allegation that Plankett made. I'm just asking a question. Okay. I'm sorry. Do you disagree with that? Am I misunderstanding? It depends upon the circumstances involved in the incident whether or not they think that it's something that's involving more than. I'm sorry. You want to give me your explanation. I don't really care about the explanation. Correct. I really want to know what they have alleged, because that's how we review summary judgment. Right. If they have alleged things and they have created a prior issue of fact on it, we go to their facts. The fact that you have other facts that go the other way is interesting, but irrelevant at this point. So I'm really trying to figure out what it is you concede they have established as an issue of a fact, as a disputed issue of fact. And specifically, what I'm calling for is do you concede, do you dispute about it? I do dispute an issue of material fact on the point that the skin color of the inmate or inmates creating the incident or causing the incident that leads to a lockdown will govern the order of release from the lockdown. If you share the skin color of that inmate, you will get released more slowly. I think I understand, and I think you're saying in every single incident. If that's true, that is not true. I don't understand the policy. The policy that he complained about was as it relates to these incidences in which there was group action that it was unfair for him that after the May 5, 1995 incident, where they did a complete review of files and interviews with all the black inmates to try to identify those that were in the East Coast Crips, which was the gang that he was cleared, and now because I'm black. Let's deal with that incident then. What rationality is there to tie the race of the inmates who originate the incident to the release of other inmates who have nothing in common with him except skin color? I mean, what is there in the record to support the rationality of that? The warden and Ms. Garcia both gave declarations which indicated that they did, and we provided all the reports that they had reviewed each and every inmate to try to determine who was in this particular prison gang which was all black. Once they did that, they shipped them all out. They thought they had them all out. Then 17 days after the original incident, everybody returned to work, and that was on May 22. Mr. Walker returned to work earlier on the 18th. The investigation was completed on the 17th. On June 18th, we have another incident in which there are four black attacking staff members in which there were injuries, and then what happened was they went to redo all the files because they had found out that the incident was, again, with black gang members, this time from two different gangs that were in the prison, so they therefore redid the review to see if they can get the troublemakers out. He objected to that, saying, look, I was cleared in May, but everybody was treated the same. That was black. If it had been a white gang, it would have been the same for whites or a Hispanic gang. And this is based on the presumption that gang membership is by race? It's driven by not the assumption but the knowledge of the experience of the administrators and the experience at this particular prison that the inmates were divided in racially gangs. There wasn't a mix of races in the gangs. In the presumption that everybody who is of that race isn't a gang? No, it's not. They are trying to determine who it is that would be in the gang, so that they could have them removed from the institution, which they did. The first time it didn't work. The second time it worked fairly well until you're talking about a lockdown of three days. On the June 18th incident, Mr. Walker was cleared to work with other black workers on the critical workers list, and they started the next day on the 22nd. I don't think that's very unreasonable when you have a number of incidences in which you're having staff members that are being attacked and stabbed. All right. So a number of months later, at the end of October. Correct. A staff member is stabbed by an African American, and the same process takes place, correct? Correct. But in that particular incident. And that's because? Because they thought it could be part of this pattern. Once they determined what the cause was, they then released everyone that worked. So that's four months later, this incident takes place. Correct. It's a one-on-one, is that correct? I don't believe it is. I believe there were others that were involved. Okay. So when she says A and A, it's not really one-on-one in that sense. Correct. It may be one that did the stabbing, but others that participated. All right. I think that in order to look at this, that there is a rational relationship between the penological interest, which, of course, is the security of the institution. And we have another thing as to the original incidences where you have racial fighting between two racial groups, which are the Hispanic and the black inmates. If we didn't lock down everybody to cool down the situation, we would then be putting people at risk, and therefore, then they would say that we didn't protect them. So, I mean, the Administration can't win. The second part is I believe that the Jones v. California, in which the Turner v. Safley test was done, the second prong is whether there are alternative means of exercising rights that remain open to inmates. And in Johnson, the Court looked at that and said they looked at the system as a whole, and there's no question from the Johnson decision that this is not a segregated system like they had in Alabama and some of the other cases, and therefore, that I think that they meet the second prong. The third is the impact the accommodation of the right will have on staff and inmates and an allocation of prison resources generally. Again, we're talking about a staff having to search the entire prison for weapons that are stashed here, there, and everywhere, which is one of the reasons of the lockdown, purposes for investigation, why it occurred. Kennedy. No, nobody objects, or at least I don't know how many objects, to locking down everybody and keeping them locked down while you're doing a search. But I think the objection is to release the people at differential times based on their race. I think it's the duty. Excuse me. That's still problematic. I don't think Johnson – I mean, Johnson went off on the fact that he couldn't tell and didn't know the gang affiliation and the like of these inmates because they were just coming into the system. He needed a certain time to figure it out. But I thought Johnson was pretty careful to make it clear that dance is an exception and that racially it's an exception born of the fact that you don't know very much and you don't have time to find out. If you sort of bring them to prison and stick them in the wrong place before you find out about them, then you have a serious problem. To me, what you're suggesting sounds like a much broader policy of even when you have a chance to learn about the inmates, even if you've been around for a long time, even if you've investigated them before, even if you know quite a bit, you're still going to make racial presumptions. And I don't know that that can be squared with Supreme Court precedent. Well, Your Honor, if I can, I would disagree in that how much do we really know? I mean, the proof of the pudding is that in May they thought they had all the gang members, and then a month later we have the same thing happen again. They didn't have them all. Their intelligence or their files were not complete. That we also would deviate. But that rationale has no limits whatsoever because you never know really. You never have complete information about anybody. In that case, you would say, you know, we think the blacks are color makers, and we're going to keep them locked down all the time because, you know, we've had the sense that they're the big color makers, and we'll just keep figuring it out. I just don't see a limitation to that rationale. I think Johnson was pretty careful to say, Look, this is not a case for today only. It's a case of prison segregation. When they come in, you get a first flight. You've got six weeks or 60 days. I forget what time it is. Sixty days. Sixty days to figure it out. And after that, thank you very much. It was end of it. Is that what Johnson really says? Yes, but the difference here is you're talking about a reaction to certain incidences which compromise the security of the institution, including the safety not only of staff, but also other inmates. Johnson says you can do all that, but after you've had a chance to figure out about the inmates and given the reasonable time to investigate, you've got to treat them all the same. You can no longer use racial classifications, which is what it sounds to me like what you guys are doing here. Why, you know, why Garcia's on a mission? And isn't this really in conflict with Johnson? I don't think so. I think that the what Johnson is talking about is the paramount security of the institution. When there are incidences that occur. Let me get it a different way, okay? Okay. Let me get it a different way. Let's say we write an opinion in your favor. I just can't figure out, assuming you're trying to figure out how I would write something like that, what limit there would be on the right of prison authorities to say, well, we think there is a race relationship, and we're going to get there through the tunnel of gang membership. Gangs are racially segregated by choice. People of particular races will, not all people of the same race will belong to the gangs, but that goes either way. Only people of that race. And therefore, because of gang membership, we will always have a reason to treat people differentially because we can use it. I mean, next time we'll get a different cell block. And they'll tell us, well, you know, we can't tell. We don't know, you know, these people, you know, we find it safer to have different cell blocks, white cell blocks and black cell blocks, and then they don't fight. How would we write an opinion that doesn't permit that to happen? Maybe we should. Maybe that's what Thomas says, in your view. I don't agree with that. I think that what you have to do. You think segregated cell blocks would be a problem? Yes. And you won't stand here two years from now arguing that those segregated cell blocks aren't necessary because you never know, because we have all these riots and all these international incidents, and we find that you can never tell for sure what people hide and what membership they have, and it's much safer, and it's therefore rational. I think it has to be whatever you look at. Well, why is it irrational to segregate? I mean, let's say they do that, okay? Let's say they put white and black and Hispanic prisoners in different cell blocks, and we get something from the board saying, you know, we think that this will promote prison discipline and safety of staff and so on, and the answer is irrational. Well, there's more than just rationality. That's the Turner test. There's four things as to alternatives. I would say, if I can, just as to take what you said, there are lawsuits that are filed, as this Court well knows, that on the segregated housing unit, I mean, when I say segregated housing unit, I mean where they put the bad prisoners, that when they gave yard time to the races at the same time, all it did was end up in the fights. Now, if that is the occasion... But what better thing to do than to just keep them in separate prisons? We'll have the white prisoners and the black prisoners, separate for the evening. But what I'm saying is it has to go by the specific problem that you're facing and what solutions there may be. And like in the particular incident I'm thinking of, we had black gang members, white gang members. As soon as they saw each other, they went at each other, constantly, constantly, constantly. I think you're sort of agreeing with me. It depends on ñ in that particular incident, but not ñ there's no reason right now that I can see that anything has been put forth that would mean that there would be an improvement in the situation in this particular prison. Somebody who has been given a job in the library and who has been checked out and may far not have been a gang member has gotten a position of trust within the prison and therefore is known to the prison authorities about as well as you will ever hope to know an inmate. And I realize there's a limit to that. And not let that prisoner out along with other people, at least in terms of jobs, just because he is born black. I don't understand. Once we step over that threshold, I don't see a stopping point. I think you have to look at the reality of the fact as to what goes on in the prison. Warden Pruenty has said in his declaration that we had prison gang problems, we had racial problems between the races that was constant, and that we were trying to solve this. That's why we go back to the ñ to the ñ to the test, the four-pronged test. Well, isn't this what you need to take to the Supreme Court and get them to rule that ñ what was that case in the 60s? Lee v. Washington. That's the one. That's the one, you know, when we have affirmative action in prison. We use ñ we use ñ we use race-conscious policy. Isn't that where you have to go? No. The Supreme Court has held that where it's rational and where it's the least alternative or least restricted alternative, that's what it takes. And I would point out that if you look at the time periods, we're not locking up people by race for long periods of time until the investigation is completed. You're talking days. In most cases, four or five days. I don't think that's irrational if we're having people attack both inmates and staff members. They have a duty also to protect the other people. Excuse me? Yes, I did. And I can explain why. Why? Because ñ Why do you think it was justified to spend hundreds of thousands of dollars of taxpayer money? Well, I disagree with that amount, but we had taken the ñ No, it wasn't done that way, was it? No. What we were trying to do was trying to find where we have a ñ under the Prisoner Litigation Reform Act, if a person was no longer an indigent or could afford something. Well, what did you hope to gain by it? We wanted to get a ruling as to the effect of the PLRA at the time, because we had an inmate. At the time, he was ñ it was a correct decision. Were you prepared to ask him? No, it was not. All you would achieve is that this guy would have to pay a few hundred bucks out of his prison accounts to the court. It would benefit the taxpayers of California, not one bit. Well, I disagree. If inmates did not have a free ride into court when they have a job, when they ñ when, in this case, he gave money out to charity, that we thought it would be better in the long run, and we wanted to test that with the Southern District, where I was at the time, to find out what the parameters were. It had nothing to do with Mr. Walker himself. As a matter of fact, we made the motion in a couple of other cases. And the court refused to go back and review it again. It looks like an anti-harassment to me. Well, I can assure you, since I did it, it was not. Well, you may not think it was. Lawyers sitting in their offices often think that what they're doing is perfectly justified and okay. But you should sometimes consider what it looks like. This is not something that would have benefited the taxpayers of California. We believe it would have discouraged a lot of these cases. The attorneys may discourage lawsuits. A lot of the unmeritorious lawsuits that we were receiving, it just happened to be that Mr. Walker had a job, was bringing money in, and was giving a sizable contribution to charities on a monthly basis. For what it's worth, you did not enhance your credibility with me. I can see that. But that was the reason, Your Honor. Okay. Thank you. Is there any other questions? I think we're way out of time. I would have had time. Thank you very much, Your Honor. I appreciate it. Sometimes the better part of wisdom is to recognize when you're ahead. Your Honors, I just wanted to point out that at the district court level, as you're The district court never actually even reached the question as to whether the use of a racial classification with regards to critical worker status and also contact visits, as you may have seen in Mr. Walker's papers, were reasonably related to prison security objectives. And that's because the court basically said Mr. Walker needed to prove discriminatory intent or purpose. But it's pretty clear that they used a racial classification. And in their papers and in their incident reports, they specifically state Your Honor has a lot more experience than you do. If I were you, I would take your advice. Pardon? Your Honor has been around as a bar for a lot longer than you have. If I were you, I'd take your advice. Thank you. However, I would like to thank or acknowledge your participation in that of your law firm, I think, in the pro bono program. The court appreciates it. Thank you. Thank you. Okay. Next case on the calendar. Next case on the calendar. Channex Saquit. U.S. National Guard. Next case.
judges: Kozinski, Fernandez, Rymer